The opinion of the court was delivered by
Watkins, J.
This suit has for object the recovery of a newspaper plant styled the Lake Charles Echo, and the paraphernalia appertaining thereto.
It is directed against Mayo as the party in possession claiming ownership; and against R. O. Gilliland as lessee, the relief demanded being the restitution of the property and the cancellation of the lease.
The property was sequestered by the plaintiffs and bonded by Mayo —Gilliland making no defence, and no one representing him at the trial.
The defence is a general denial, coupled with an averment that Mayo purchased from R. C. Gilliland, on March 16, 1892. And, in in the answer, is incorporated a plea of estoppel, by way of exception, to the effect that plaintiffs were precluded by their laches and negligence from asserting and setting up title in themselves.
Upon these issues the cause was tried and decided against the plaintiffs — the judgment rejecting the plaintiffs’ demands, dissolving the sequestration and reserving defendant’s right to sue for damages.
Plaintiffs, Reid and Andrus, claim to have acquired the property in controversy in 1890, from J. W. Bryan, for a valuable consideration actually paid by Reid, though title was executed in favor of Thomas Kleinpeter, who subsequently executed title to Reid for *1093 twenty-eight-thirtieths, and to Andrus for one-thirtieth — Kleinpeter retaining'title to one-thirtieth.
That the three organized a company, or copartnership, styled The Lake Charles Eeho Publishing Company, and in that capacity operated the plant.
That subsequently, Reid acquired the interest of Kleinpeter, and, on the 23d of June, 1891, the company leased the outfit to R. O. Gilliland for the term of one year, with the privilege of renewal for another year, at $100 per month, during the term of the lease — the lease being evidenced by a written argreement that was left in the possession of the lessee.
Petitioners declare that they are still the rightful and legal owners of the plant and property; that Gilliland has paid no part of the rent, or lease price thereof, and has violated and broken all of his engagements, and absconded, abandoning the property; and that Mayo has by some means acquired possession thereof and is claiming ownership, operating same to their detriment and injury, and is endeavoring to dispose of it against their will.
In the brief of defendants’ counsel we find the following admissions of fact, viz., that James W. Bryan sold and delivered the newspaper plant in controversy to Thomas Kleinpeter for the price of $5500, of which $3250 was paid in cash, and, for the residue, notes of the purchaser were executed, maturing during the year thereafter ensuing — the sale being evidenced by a notarial act, and same being duly recorded in the conveyance records of the parish. That upon the same day (March 14, 1890) Kleinpeter conveyed to Reid and Andrus twenty-nine-thirtieths interest in the plant, as stated in the petition, and that subsequently the three parties named formed themselves into a company for the publication of the newspaper, as plaintiffs allege.
They further admit that “ on June 23, 1891, plaintiffs leased to R. O. Gilliland the Eeho (newspaper), and that Gilliland went into possession as editor and publisher, with his name promulgated as such on the title page of the paper until the issue of February 5, 1892;” but they aver that in the issue of the paper under date February 12, 1892, Gilliland announced himself to be editor and proprietor, and that this announcement remained until the time of the sale of Gilliland to Mayo, on the 18th of March, 1892 — it being followed by the subsequent publication of Mayo’s salutatory in the issue of the paper under date of March 18, 1892.
*1094 It is further alleged and insisted upon that during the interval that intervened between the dates of the two announcements, “Mayo remained in quiet, open and undisputed possession of said paper as owner, without molestation, until the institution of this suit on the 3d of May, 1892.”
Up to this point the averments and admissions conclusively establish the plaintiffs’ title, and the possession of Gilliland as lessee under plaintiffs, on the 23d of June, 1891, and continuously thereafter to the 12th of February, 1892, at least.
It just as necessarily follows that defendant’s claim of title arose subsequently and must depend upon facts subsequently arisen.
Looking into the record we find the indicia of defendants’ title to be as follows, viz.:
First — A receipt, which is couched in the following terms, namely:
“New Orleans, March 8, 1892.
“ Received of R. O. Gilliland, representing J. H. Gilliland, the sum of five hundred dollars, first payment on Lake Charles Echo newspaper.
(Signed) “0. McD. Puckette.”
Second — A bill of sale from R. O. Gilliland to Thad. Mayo for the price of $2000 cash, expressing full warranty, bearing date March 16, 1892.
There is nothing to connect the title of Puckette with that of Reid, Kleinpeter & Andrus, nor is there anything pointing to the source of his title as being derived from any other person than the plaintiffs.
In this situation, it is manifest that the sole reliance of the defendants to cure this apparent defect is upon their plea of estoppel. In fact, counsel for defendant, Mayo, do not make any mention in their brief of his alleged title from Gilliland and Puckette, but rest their defence exclusively upon their plea of estoppel, formed upon the plaintiffs’ laches and negligence in asserting their claims.
It is quite true that, in the answer, there is an averment to the effect that, from the 12th of February, 1892, Gilliland (Mayo’s vendor) “ was in peaceable, public and undisturbed possession of said Lake Charles Echo, as editor and proprietor thereof;” and further to the effect “ that said Gilliland represented himself to the defendant as owner thereof, and believing such to be the ease, he pur-, chased from him in good faith,” etc. Yet,'in argument and brief, no stress is laid, or point made, upon the title he obtained from *1095 Gilliland and Puckette, and without which the possession and pretensions of Gilliland are vain and nugatory.
Roundly stated, we have for consideration and solution the proposition that Gilliland, as lessee of the plaintiffs in June, 1891, and continuously thereafter, until February 12, 1892, converted himself into an owner of the plant and property leased, during the term of his lease and without the knowledge or consent of the lessor, and by the unique and simple process of changing the name of the responsible head of the paper from “ R. O. Gilliland, editor and publisher ” to “ R. C. Gilliland, editor and proprietor.”
That, lorsooth, the plaintiffs did not observe that alteration and immediately protest against it, and failing to have this prolest heeded and to have at once brought suit, they are guilty of such laches and negligence as to preclude the assertion of their rights; defendant founding his claim upon this apparent change in the proprietorship of the newspaper and the alleged assertion of Gilliland’s ownership.
As a proposition of law the foregoing is altogether untenable, for, as a lessee of the plaintiffs, Gilliland was wholly without legal right to so alter or change his relations toward his landlords during the term of his lease, as to acquire the ownership of the thing leased, without the knowledge or consent of the lessors, and he could convey no better rights to a stranger. But Mayo confesses, and his counsel admit, that Gilliland occupied and operated the newspaper plant, as lessee of the plaintiffs, up to the 12th of February 1892, and consequently he was put upon his guard in reference to Gilliland’s right to sell.
The district judge in his reasons for judgment states that inasmuch as the law pronounces the nullity of the sale of a thing that belongs to another, the court would be at once satisfied of plaintiffs’ ownership if no plea had been interposed in bar of their recovery; and then states his conclusions to be that the following difficulties are in their way, viz.:
1. That prior to the institution of this suit neither of the plaintiffs had disclos'ed their names as owners of the paper.
2. That, construing their acts logically, they had purposely concealed any proprietary interest they had therein.
3. That they at first substituted Kleinpeter as the ostensible owner, and thereafter disguised their real ownership behind the mask of the Lake Charles Echo Publishing Company.
*1096 4. They then placed it under the control of R. C. Gilliland as editor and manager, and afterward the paper passed to R. C. Gilliland as editor and proprietor, who assumed that title at the head of the editorial columns of the paper without attracting attention, and, with respect to third persons, without objection on the part of plaintiffs.
5. That when the plaintiffs were informed that the defendant was bargaining for the purchase of the property, they maintained silence and made no protest against the accomplishment of an act in which he would have had such manifest interest if he had been owner.
His observations are thus concluded:
“Not only before the sale was effected did he fail to warn defendant, Mayo, and put him on his guard when he had an opportunity to do so, but that he preserved the same policy of silence after the sale to Mayo, and made no demand for the restitution of the property, and allowed the defendant to quietly take possession of the property, and for nearly two months failed to signify by word or deed that he laid any claim to the property.”
As opposed to the foregoing inferences which the judge a quo has drawn from the evidence in substantiation of the defendants’ plea of estoppel, the testimony shows that the plaintiffs had not observed the change Gilliland had made in the apparent proprietorship of the paper, and that same had been made without his knowledge or concurrence; yet Mayo was informed of the fact on the very day same occurred. It further shows that just as soon as Reid was advised of Gilliland’s contemplated sale of the plant, he interviewed him on the subject, and he disavowed any such intention in the strongest possible language.
Assuming this statement to be true, what was the necessity for Reid to have taken the additional precaution of forewarning Mayo, when no sale was contemplated by Gilliland. Conceding it to have been a fact that Mayo was advised of the ostensible change in the proprietorship of the paper, was it not his duty to have mentioned to Reid his contemplated purchase from the person whom he knew to have been his tenant? And if Reid acted improperly in not disclosing his ownership, did not Mayo act just as imprudently in not making proper inquiry into Reid’s claim of ownership?
These questions must receive an affirmative answer. But there are other facts that must be taken into account, also, in determining-the efficacy of the defendant’s plea of estoppel.
*1097 In the first place, Bryan sold the newspaper plant to Kleinpeter in 1890, and executed a notarial act of transfer, and caused same to be recorded in the conveyance office; and Mayo, being clerk of court at the time, was aware of that fact, confessedly.
More than a year previous to his purchase of Gilliland, Mayo was informed that Kleinpeter had sold the paper, and was likewise advised that the plaintiffs were the persons composing the Lake Charles Echo Publishing Company.
As a witness Mayo states that seeing the name of Gilliland at the head of the paper was the first direct information that he had that he was owner of the paper. But this question is not open to inference, as the judge a quo submits, for the plain reason that the testimony of ihe defendant is full upon the subject. He makes the statement that he asked Gilliland “if the paper belonged to him, and he answered that his father, J. H. Gilliland, was negotiating to purchase the paper, and as soon as the trade was made he would let him know, and that he was expecting his father every day; that his father came a short time afterward, and R. O. Gilliland came to him and asked him to go around and see his father at the Howard House, his father having come in late the night before and wanted to get off to New Orleans on the 11 a. m. train; that he went with him and met his father, J. H. Gilliland, who informed him that he was then on his way to New Orleans to close his trade for the Lake Oharles Echo, and that if he made the trade he would let B. G. Gilliland his son,, know, and any trade he (Mayo) might make with his son would be all right. Several days afterward, R. O. Gilliland informed him that the trade was made, and he (R. O. Gilliland) announced his name as editor and proprietor. That he then commenced negotiating with B. G. Gilliland for the paper, which was finally consummated on the 16th of March, 1892.”
This testimony clearly indicates that instead of Mayo having been deceived by appearances in regard to Gilliland’s apparent show of ownership, and the silence and inaction of the plaintiffs, he acted with great deliberation, and was fully advised by Gilliland of all his plans, antecedent to the change of ostensible proprietorship of the paper.
But the Puckette receipt, under which Gilliland sets up his claim of title, discloses that he had the negotiations referred to at least three weeks subsequent to said change of proprietorship; and that Mayo was fully advised of these negotiations his-own testimony will attest.
*1098 “Being shown document No. 2 (the Puckette receipt), says he: ‘The first he saw of it was in New Orleans, on the 8th of March, 1892. It was shown to him by R. O. Gilliland. He had furnished him $600 to consummate the trade for the Echo. That was on Monday, the 7th of March, 1892. That he (Gilliland) went around to get a bill of sale from Puckette, as he told me, promising to meet me between 2 and 8 o’clock. He had with him a bill of sale — a notarial act which was signed by O. McD. Puckette, conveying to Gilliland the Lake Oharles Echo newspaper, for, I think, $600 cash, and the balance on one, two and three years’ time, stating that this act had been left at the notary’s office for him and Gilliland to sign. That he looked at this act of sale and told him that if he purchased under that sale he had no use for the paper, and would not buy it, as it contained a vendor’s lien. He (Gilliland) then left him, and said he would go back, see Puckette, and get a different kind of sale. That he saw him no more on that day, but the next day, the 8th, he met him * * * when he showed him the receipt marked No. 2, stating that he had saved $100 by holding on, but that Puckette refused to give him any other kind of a sale than the one drawn up the day before.” ’
This interview occurred nearly one month subsequent to the alleged change of proprietorship of the paper, and fully advised Mayo that Gilliland had no title at that date, nor for three weeks afterward. It gave him the fullest and most complete knowledge that Gilliland pretended to have no claim to the paper at the time the published announcements were made that he was proprietor, and that he did not claim to have any for nearly three weeks thereafter.
Taking this evidence into consideration, there is no foundation for defendants’ plea of estoppel. But the learned judge a quo also makes reference to the published circular that Reid issued, and in which it is said he “ expressed, in a public and unequivocal manner, more than a month after the sale and delivery of possession of the Echo to the defendant, and declared that his opponents had bought up all the Lake Oharles newspapers, and alluded to Mr. Thad. Mayo, the defendant, as present editor and proprietor of the Lake Oharles Echo;” and other similar statements.
In the first place this evidence does not respond to defendant’s plea of estoppel, which rests exclusively upon the plaintiffs’ alleged laches and negligence. But, giving these recitals full force and effect, they do not go to the extent that is contended for them.
*1099 The principal recitals that are relied upon, are to the effect that Reid’s political opponents had, by the lavish use of money, “ bought up all the Lake Charles newspapers,” and “ that he had no newspaper to reply to his many attacks,” etc. These statements were made with reference to the then existing campaign and the influences that had been brought to bear on his canvass, and amongst other things he evidently referred to the editorial control of the parish newspapers, generally, being adverse to his interest
Same are not inconsistent with the plaintiffs’ ownership of the property, and is fully explained by other evidence already adverted to and considered.
A careful and painstaking examination of the transcript and a full investigation of the whole evidence has satisfied us -that the plaintiffs have fully substantiated their claim of ownership, and that they should have judgment for the property in dispute.
It is therefore ordered and decreed that the judgment appealed from be annulled and reversed; and it is further ordered and decreed that the plaintiffs be decreed the owners of the newspaper plant and property in controversy, and placed in possession; that the sequestration be sustained and enforced, and that the defendants be taxed with the costs of both courts — the plaintiffs demand for the revocation of lease being dismissed as of non-suit.